AO 91 (Rev. 11/11)  Criminal Complaint (approved by AUSA M. Crawley) — USAO CW No. 24-022

# UNITED STATES DISTRICT COURT
for the
Eastern District of Pennsylvania

| | |
|---|---|
| United States of America<br>v.<br>ZAVEN YEGHIAZARYAN<br><br>*Defendant(s)* | Case No. 24-MJ-1233 |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __6/8/2020 and 3/25/2024__ in the county of __Philadelphia__ in the __Eastern__ District of __Pennsylvania__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §1343 | Wire Fraud |
| 18 U.S.C. §1957 | Money Laundering |
| 18 U.S.C. §1028A | Aggravated Identity Theft |

This criminal complaint is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

/s/ Stewart Kukis
*Complainant's signature*

Stewart Kukis, Special Agent, IRS-CI
*Printed name and title*

Sworn to me telephonically and signed electronically

Date: _____

Digitally signed by ETH Signature
Date: 2024.08.01 11:18:19 -04'00'
*Judge's signature*

City and state: Philadelphia, Pennsylvania

Elizabeth T. Hey, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Stewart Kukis, being sworn, state as follows:

### Background of Affiant

1. I am a Special Agent ("SA") with the Department of Treasury, Internal Revenue Service – Criminal Investigation Division ("IRS-CI") and have been so employed since August 2016. I am currently assigned to the Newark Field Office of IRS-CI. As a special agent of IRS-CI, I am responsible for investigating federal tax and financial crimes, violations of the Bank Secrecy Act, the Money Laundering Control Act, and related offenses. I have participated in more than 100 criminal investigations; I have served as an affiant on multiple search and complaint warrants; and I have assisted in executing numerous search and arrest warrants.

2. I am a graduate of the Federal Law Enforcement Training Center's Criminal Investigator Basic Training Program, as well as the IRS Special Agent Investigation Techniques Training Program. I earned a Bachelor of Arts degree in Economics in 2008 and a Master's Degree in business administration in Professional Accounting and Information Technology in 2009 from Rutgers University. I am an active Certified Fraud Examiner.

3. Through my training and experience, I have become familiar with the types of records businesses typically maintain in the course of their regular activities, including ledgers, journals, invoices, receipts, and bank documents. A substantial portion of my duties as an IRS-CI SA involves analyzing these types of records to determine the existence of criminal activity and to develop evidence of criminal activity.

4. The facts in this affidavit come from my personal observations, my training and experience in conducting financial and other investigations, information obtained from other law enforcement officers, examination of documents and records, recorded conversations, and interviews of witnesses. This affidavit is intended merely to show that there is sufficient probable

cause for the issuance of the requested warrant and does not set forth all of the information known by myself and other law enforcement officers in this investigation. Rather, I have set forth only facts sufficient to establish probable cause to issue a warrant to arrest ZAVEN YEGHIAZARYAN.

## Purpose of the Affidavit

5.  As explained in detail below, there is probable cause to believe that ZAVEN YEGHIAZARYAN ("YEGHIAZARYAN") committed within the Eastern District of Pennsylvania and elsewhere, violations of 18 U.S.C. §§ 1341, 1343, 1957, and 1028A, which statutes prohibit mail fraud, wire fraud, money laundering, and aggravated identity theft, respectively. I submit this affidavit in support of a criminal complaint and warrant to arrest YEGHIAZARYAN for (a) three counts of wire fraud, in violation of 18 U.S.C. § 1343; (b) two counts of money laundering, in violation of 18 U.S.C. § 1957; and (c) two counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A.

6.  Homeland Security Investigations ("HSI"), the United States Postal Inspection Service ("USPIS"), IRS-CI, the United States Department of State, Diplomatic Security Service ("DSS"), Social Security Administration, Office of the Inspector General ("SSA-OIG"), U.S. Health and Human Services, Office of the Inspector General ("HHS-OIG"), U.S. Department of Transportation, Office of the Inspector General ("DOT-OIG"), and U.S. Department of Labor, Office of the Inspector General ("DOL-OIG"), are assisting a federal grand jury that is investigating YEGHIAZARYAN for mail fraud, wire fraud, money laundering and aggravated identity theft. As detailed below, investigation has shown that YEGHIAZARYAN uses the identities of other persons, and shell corporations, to commit wire fraud, in order to obtain money and property, and then in some cases launders the proceeds of those frauds.

## Applicable Laws

7. Title 18, United States Code, Section 1341, makes it a crime to knowingly devise or intend to devise, a scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations or promises, and to use or cause the use of the United States mails in furtherance of the scheme.

8. Title 18, United States Code, Section 1343, makes it a crime to knowingly devise or intend to devise, a scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations or promises, and to transmit or cause the transmission of interstate wire communications in furtherance of the scheme.

9. Title 18, United States Code, Section 1957, makes it a crime to knowingly engage or attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000 that is derived from specified unlawful activity, including wire fraud in violation of 18 U.S.C. § 1343.

10. Title 18, United States Code, Section 1028A, makes it a crime to knowingly transfer, possess, or use, without lawful authority, a means of identification of another person, during and in relation to any enumerated felony violation in subsection (c) of Section 1028A, including mail fraud in violation of 18 U.S.C. § 1341.

## The Small Business Administration

11. The United States Small Business Administration ("SBA") was an executive branch agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy in a variety of ways, including by fostering the establishment and viability of small businesses and aiding in their economic recovery after community disasters.

12.     As part of its efforts, the SBA provided for business loans through banks, credit unions, and other lenders. Those loans had government-backed guarantees.

### The CARES ACT and EIDL Program

13.     Enacted in March 2020, the Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law designed to provide emergency financial assistance to the millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. The SBA administered the Economic Injury Disaster Loan program ("EIDL program"), which provided small businesses with working capital loans of up to $2 million to help overcome temporary loss of revenue as a result of a declared disaster. The CARES Act provided new rules that made it easier for small businesses that were economically damaged by the coronavirus pandemic to apply for and quickly receive loans.

14.     To apply for a loan under the EIDL program, a small business was required to submit an application to the SBA containing truthful information about the business's operations, listing, among other things, the number of employees, and gross revenues and cost of goods sold for the 12-month period preceding the disaster. In the case of EIDL loans for COVID-19 relief, the 12-month period was the 12-month period from February 1, 2019 to January 31, 2020.

15.     The application for an EIDL loan informed the applicant that by signing the application, the applicant certified that all information in the application, and submitted with the application, was true and correct to the best of the applicant's knowledge. The application further warned that any false statement or misrepresentation to SBA may result in criminal prosecution, among other penalties. The applicant must state, under penalty of perjury, that they were eligible and provide any information that the SBA determined to be necessary.

16. The application process was performed online. The applicant was required to fill out assorted data fields relating to the size of the affected business entity, the ownership of the business, and other information such as the number of employees and gross business revenues realized in the 12 months prior to COVID-19's impact on the national economy. This information, submitted by the applicant, was then used by SBA to calculate the principal amount of money the small business was eligible to receive in the form of an EIDL program loan. In addition, in conjunction with the submission of an EIDL application, an applicant could request and receive up to $10,000 in an EIDL cash advance grant based on the number of employees claimed, simply by clicking on and checking a box within the on-line application. The EIDL cash advance grant was not required to be repaid to SBA if the loan application were ultimately denied by SBA, or if the applicant were to decline the EIDL loan that was offered by SBA at a later date.

17. EIDL applications were submitted directly to SBA, then processed by SBA with support from a government contractor. If the application were approved, the amount of the loan was determined based in part on the information provided by the applicant about employment, revenue, and cost of goods sold as described above. EIDL proceeds and available cash advance grants (up to $10,000) were funded by the SBA and were disbursed from government-controlled accounts maintained with the U.S. Treasury at Federal Reserve Banks throughout the United States.

18. The EIDL program required that funds be used for working capital to make regular payments for business operating expenses, including payroll, rent/mortgage, utilities, sick leave, production costs and business obligations, such as debt, rent, and mortgage payments. EIDL proceeds were not permitted to be used for personal expenses.

19. As detailed below, YEGHIAZARYAN defrauded and attempted to defraud the United States government through fraudulent EIDL applications.

20. The Exchange Visitor Visa for Summer Work and Travel, also known as the J-1 visa, was a non-immigrant visa issued to qualified post-secondary students to visit the United States for cultural exchange and short-term summer work. The J-1 visas supported U.S. foreign policy interests by increasing mutual understanding and cultural exchanges between the people of the United States and other countries. The visas were approved by the Department of State, Bureau of Educational and Cultural Affairs. Eligible individuals with J-1 visas were allowed to obtain a Social Security number ("SSN") assigned by the Commissioner of Social Security, in order for the J-1 visa holder to work while present in the United States.

21. The Diversity Immigrant Visa, also known as the DV visa, was issued to qualified persons from countries with low immigration rates to the United States. The visas were approved by the Department of State, Bureau of Consular Affairs. Eligible individuals with DV visas were allowed to obtain a Social Security number ("SSN") assigned by the Commissioner of Social Security, in order for the DV visa holder to work while present in the United States.

### Summary of the Investigation

22. YEGHIAZARYAN currently resides in Bucks County, PA; previously, YEGHIAZARYAN resided in Philadelphia. PA. As detailed below, investigation has shown that YEHIAZARYAN has utilized shell companies, in addition to the identity of another person, to (a) conduct a wire fraud scheme to defraud the United States government, by applying for and obtaining EIDL proceeds under false pretenses; and (b) launder the proceeds of the fraud. Investigation has shown further that more recently, YEHIAZARYAN has committed aggravated identity theft in connection with a separate mail fraud scheme.

23. On or about September 25, 2018, officers with Customs and Border Protection ("CBP"), Philadelphia, intercepted a package from China containing nine counterfeit Pennsylvania drivers' licenses. The package was labelled for delivery to an individual, "D.R.," at 292 Ridgeway Plaza, Philadelphia, PA 19116. Law enforcement databases identified D.R. as a former J-1 visa holder who had departed the United States six years earlier, on or about September 20, 2012, and had not returned to the United States since his departure. The nine counterfeit Pennsylvania driver's licenses utilized the biographical information of former visa holders, but the pictures were of different individuals, whose identities were unknown to law enforcement at that time.

24. Law enforcement databases revealed that the former visa holders whose identities were utilized on the nine counterfeit driver's licenses had departed the United States and had not returned since their departure.[1] Most of the individuals whose identifying information was used on the counterfeit drivers' licenses had departed the United States between 2008 and 2012.

25. Federal investigators conducted consensual interviews of individuals residing at 292 Ridgeway Plaza, Philadelphia, PA, 19116 as well as persons residing at two other addresses found on the counterfeit Pennsylvania driver's licenses: 806 Selmer Road, Philadelphia, PA 19116, Apt. B, and 1951 Ambassador Street, Philadelphia, PA 19115, Apt. 1. While at these addresses, investigators discovered mail at each address from United States banks, addressed to former visa holders who had previously departed the United States.

---

[1] TECS, formerly known as the Treasury Enforcement Communications System, is used by the U.S. Department of Homeland Security to manage the flow of people through border ports of entry and for immigration enforcement case management.

26.     Pursuant to the information obtained during the interviews, agents submitted the identifiers found during the investigation to a confidential source ("CS"). The CS revealed a bank fraud scheme in which the identities of departed former visa holders were being used in the Eastern District of Pennsylvania to fraudulently obtain loans and lines of credit which would not be repaid to the issuing banks. As of the date of this affidavit, investigators have identified over 160 separate bank accounts affected by the bank fraud scheme.

27.     As part of the investigation, the grand jury issued subpoenas to multiple banks for bank records for the accounts identified by the CS as compromised in the J-1 visa/bank fraud scheme. Financial analysis and investigation into these bank accounts showed that at least some of the compromised bank accounts were linked to YEGHIAZARYAN.

28.     At various times, YEGHIAZARYAN opened or controlled bank accounts for himself, as well as shell companies BIOWASTE SOLUTIONS, INC. ("BIOWASTE") and UNI-TEK US LLC ("UNI-TEK").

29.     Investigation has shown that from on or about June 20, 2020 through on or about August 11, 2020, in the Eastern District of Pennsylvania, YEGHIAZARYAN knowingly and intentionally devised and intended to devise a scheme and artifice to defraud the SBA, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and transmitted and caused to be transmitted, interstate wire communications in furtherance of that scheme.

30.     The purpose of the scheme was for YEGHIAZARYAN to enrich himself, by fraudulently obtaining EIDL proceeds, including by making false statements on EIDL applications about (a) the gross revenues of, (b) the costs of goods sold by, (c) the number of

employees employed by, and (d) the intended use of the loan proceeds by, the shell companies and the individual in whose names YEGHIAZARYAN sought these loans.

31. In completing and signing the EIDL authorization and agreement, YEGHIAZARAYN agreed to use all the proceeds of the loans solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020 and continuing thereafter, that is, the COVID-19 pandemic. Once YEGHIAZARYAN obtained the EIDL proceeds, he did not use them for working capital for the companies in whose names YEGHIAZARYAN had sought the loans (which in any event were shell companies). Instead, YEGHIAZARYAN laundered a significant portion of the EIDL proceeds through various bank accounts and transactions.

32. SBA computer servers that processed EIDL applications were located in Denver, CO. Information for processing and approving EIDL applications was stored there. YEGHIAZARYAN made the EIDL applications described below, electronically, from the Eastern District of Pennsylvania.

**The Wire Fraud Scheme**

33. On or about June 20, 2020, YEGHIAZARYAN cause a false and misleading EIDL application to be submitted to the SBA, in the name of a shell company he controlled, BIOWASTE, seeking approximately $150,000 in EIDL proceeds ("Loan 1"), and an additional $10,000 grant. This application was filed online from IP address 71.225.183.240, located in the Philadelphia, PA area, and was received by SBA servers located in Denver, CO. Comcast records show that at the time of the loan application, this IP address was associated with YEGHIAZARYAN as a subscriber with service at 9838 Montour Street, Philadelphia, PA 19115, located in the Eastern District of Pennsylvania. Public records show that at the time of

9

submission of the Loan 1 application, YEGHIAZARYAN was the sole owner of the 9838 Montour Street property.

34. The information that YEGHIAZARYAN submitted as part of the Loan 1 application included falsely representing that for the period February 1, 2019 through January 31, 2020, BIOWASTE had gross revenues of $560,000, cost of goods sold of $147,000, and 12 employees. However, tax returns YEGHIAZARYAN filed on behalf of BIOWASTE for tax years 2019 and 2020 showed that BIOWASTE claimed no gross receipts or cost of goods sold in tax year 2019, and $5,500 gross receipts and no cost of goods sold in tax year 2020. Those tax returns further showed that BIOWASTE did not have any employees at the time of the submission of the Loan 1 application.

35. On or about June 26, 2020, YEGHIAZARYAN opened PNC Bank account ending in 9858 for BIOWASTE with a $100 cash deposit. YEGHIAZARYAN was the sole authorized signer on the BIOWASTE PNC account ending in 9858.

36. On or about June 29, 2020, $149,900 of Loan 1's proceeds were received by ACH deposit into BIOWASTE's PNC bank account ending in 9858. On or about June 30, 2020, $150,000 (including all $149,500 of the proceeds of Loan 1) were wired to a JP Morgan Chase ("JPMC") account ending in 7999, controlled by YEGHIAZARYAN. Based on my analysis of JPMC account ending in 7999, this account was used for personal purposes.

37. On or about July 8, 2020, BIOWASTE's account ending in 9858 received an additional $10,000 EIDL grant.

38. Based upon my review of BIOWASTE's financial statements, tax returns, and other available records, BIOWASTE did not conduct substantive business activities for tax years

2019 or 2020. Based upon this review, the investigation more broadly, and my training and experience, I conclude that BIOWASTE was a shell company.

39. Based on the fraudulent statements made by YEGHIAZARYAN, Loan 1 was funded for $150,000, plus a $10,000 grant ($160,000 in total) by wire transfers to PNC account ending 9858, held by BIOWASTE, in violation of 18 U.S.C. § 1343.

40. After receiving the SBA funds for BIOWASTE, YEGHIAZARYAN promptly laundered these funds. On or about June 30, 2020, YEGHIAZARYAN laundered the funds by wiring $149,900 of the fraud proceeds to his personal bank account ending in 7999, held in his name at JPMC, ending in 7999, in violation of 18 U.S.C. § 1957.

41. Also, on or about June 20, 2020, YEGHIAZARYAN caused another false and misleading EIDL loan application to be submitted to the SBA, in the name of ZAUI, LLC ("ZAUI"), seeking approximately $26,700 in EIDL proceeds ("Loan 2"), and an additional $3,000 grant. YEGHIAZARYAN claimed that ZAUI was a commercial design company, and further claimed that it was owned by his mother, Gayane Hakobyan. YEGHIAZARYAN's Immigration records, maintained by the Department of Homeland Security, show that on YEGHIAZARYAN's naturalization application, YEGHIAZARYAN listed Gayane Hakobyan as his mother.[2]

42. This application, like the application for Loan 1, was filed online from IP address 71.225.183.240, which Comcast records show was subscribed to by ZAVEN YEGHIAZARYAN, at 9838 Montour St, Philadelphia, PA 19115 (the property

---

[2] The Department of Homeland Security (DHS) U.S. Citizenship and Immigration Services (USCIS) maintains the Central Index System (CIS). CIS is a repository of electronic data that contains an index of basic data elements related to an individual as he or she passes through the immigration process.

11

YEGHIAZARYAN owned). The Loan 2 application was received by SBA servers located in Denver, CO. The information that YEGHIAZARYAN caused to be submitted in the Loan 2 application included falsely reporting that ZAUI had gross revenues of $97,000 and cost of goods sold of $37,600 within the preceding 12-month period, and maintained 3 employees during that time. A review of IRS records shows that ZAUI has not filed an annual business tax return for either tax year 2019 or tax year 2020, much less a return that reported any revenues or cost of goods sold. While ZAUI filed Forms 941, Employer's Quarterly Federal Tax Return, for the third and fourth quarters of 2020, this is for a time period *after* the Loan 2 application was filed; furthermore, each Form 941 reported only one employee, who was paid no more than $200 total.

43.     I have reviewed ZAUI's JPMC account ending in 9179 for tax year 2019 and January 2020. ZAUI had over $184,000 in deposits into its account during these two years. I have analyzed the ZAUI JPMC account for this period; nearly all of the deposits were from YEGHIAZARYAN's related businesses and from accounts under his control. Based upon my review of ZAUI's bank records, tax returns, and other available records, ZAUI did not appear to conduct substantive business activities for tax years 2019 or 2020. Based upon this review, the investigation more broadly, and my training and experience, I conclude that ZAUI was most likely a shell company.

44.     YEGHIAZARYAN further signed, in his mother's name, on or about June 24, 2020, an EIDL authorization and agreement for Loan 2, certifying under penalty of perjury, as Gayane Hakobyan, that "he" was authorized to obtain a disaster loan in connection with the effects of the COVID-19 emergency and that none of the obligations would be used primarily for personal, family or household purposes. YEGHIAZARYAN certified that all information in the

Loan 2 application and submitted in support of the application was true and correct to the best of his knowledge, and that he understood that he could be prosecuted for making false statements on the application.

45.     Based on the fraudulent statements made by YEGHIAZARYAN, Loan 2 was funded for $26,700 and the Loan 2 proceeds were deposited into JPMC bank account ending 9179 on or about August 11, 2020. Further, SBA authorized a $3,000 EIDL grant to ZAUI which was deposited into ZAUI's JPMC bank account ending in 9179 with an authorized signor of Gayane Hakobyan on or about June 23, 2020., in violation of 18 U.S.C. § 1343.

46.     Immediately after receiving the Loan 2 proceeds for ZAUI, YEGHIAZARYAN laundered these funds. On August 11, 2020, ZAUI issued a personal check to YEGHIAZARYAN for $25,500, which YEGHIAZARYAN deposited into his personal bank account, held in his name at Wells Fargo Bank, ending in 3737, in violation of 18 U.S.C. § 1957.

47.     On or about June 20, 2020, YEGHIAZARYAN caused a third false and misleading EIDL application to be submitted to the SBA for UNI-TEK, seeking approximately $40,000 in EIDL proceeds ("Loan 3"), and an additional $2,000 grant. Like the applications for Loans 1 and 2, this application was filed online from IP address 71.225.183.240, which Comcast records show was assigned to ZAVEN YEGHIAZARYAN, at 9838 Montour St, Philadelphia, PA 19115 (the property YEGHIAZARYAN owned). The Loan 3 application was received by SBA servers located in Denver, CO. The information that YEGHIAZARYAN caused to be submitted with this application including falsely representing that UNI-TEK had gross revenues of $126,000 and cost of goods sold of $42,000 within the preceding 12-month period, and 2 employees. However, Forms 1120S, "U.S. Income Tax Returns for an S Corporation" filed by UNI-TEK for tax years 2019 and 2020, show that UNI-TEK reported gross receipts of $450 for

13

tax year 2019 and $6,000 for tax year 2020, and that UNI-TEK reported no employees or cost of goods sold for either tax year.

48.  YEGHIAZARYAN certified that all information in the Loan 3 application was true and correct to the best of his knowledge, and that he understood that he could be criminally prosecuted for making false statements on the application.  YEGHIAZARYAN further certified on the Loan 3 authorization and agreement that he was authorized to obtain a disaster loan in connection with the effects of the COVID-19 emergency and that none of the loan proceeds would be used primarily for personal, family or household purposes.

49.  I have reviewed UNI-TEK's PNC account ending in 9493, for 2019 and 2020. YEGHIAZARYAN was the sole signer on this account. The PNC Bank records show that UNI-TEK's account had approximately $100,070 in deposits into its account during this two-year period, again almost entirely from YEGHIAZARYAN's related businesses and from accounts under YEGHIAZARYAN's control, for purposes that appeared unrelated to medical equipment sales.

50.  Based upon my review of UNI-TEK's financial statements, tax returns, and other available records, UNI-TEK did not conduct substantive business activities for tax years 2019 and 2020. Based upon my review of these records, the investigation more broadly, and my training and experience, I conclude that UNI-TEK was a shell company.

51.  Based on the fraudulent statements, Loan 3 was funded for $40,000, plus a $2,000 grant ($42,000 in total). The $2,000, which was dispersed on or about June 18, 2020 by ACH deposit to the PNC account ending 9493, held by UNI-TEK with YEGHIAZARYAN as the signer on the account. Further $39,900 of the Loan 3 proceeds were wired to UNI-TEK's PNC

account ending in 9493 via ACH deposit, in violation of 18 U.S.C. § 1343. Proceeds from these EIDL funds were then wired to personal accounts under YEGHIAZARYAN's control.

### Aggravated Identity Theft

52. The investigation has further shown that more recently, YEGHIAZARYAN also engaged in aggravated identity theft, in connection with a mail fraud scheme. On or about March 25, 2024, YEGHIAZARYAN provided two fraudulent California drivers' licenses, bearing the names and dates of birth of two persons who were previously in the United States as part of the J-1 Visa Program, to individuals known to the United States Attorney.

53. On or about March 25, 2024, YEGHIAZARYAN provided a fraudulent California driver's license for E.T., date of birth May 5, 1985. E.T. was a prior J-1 Visa holder who, according to law enforcement databases, departed the United States on September 25, 2010 for her home country of Russia and has not returned to the United States since her departure. This fraudulent driver's license bore E.T.'s name and date of birth; however, when agents checked the California driver's license number on the E.T. license, they found no record of this driver's license number in the records of the California Department of Motor Vehicles.

54. Also, on or about March 25, 2024, YEGHIAZARYAN provided a second fraudulent California driver's license, for A.N., date of birth November 8, 1989. A.N. was a prior J-1 Visa holder who, according to law enforcement databases, departed the United States on August 9, 2010, for her home country of Russia and has not returned to the United States since her departure. This fraudulent driver's license bore A.N.'s name and date of birth with a California driver's license number that, according to the California Department of Motor Vehicles, had been assigned by that agency to another individual.

55. Both of these driver's licenses were provided by YEGHIAZARYAN to individuals known to the United States Attorney in connection with a mail fraud scheme. YEGHIAZARYAN had told the individuals that he was able to establish bank accounts in the names of persons who were formerly in the United States. YEGHIAZARYAN indicated that in order to open these bank accounts, he would first need to order credit reports for the stolen identities, to confirm that the identities were "clean," i.e., unused. This shows that YEGHIAZARYAN was aware that the stolen identities he was providing belonged to real persons, who had previously been in the United States.

56. On or about February 21, 2024, YEGHIAZARYAN mailed or caused to be mailed, two credit reports, one for E.T. and the other for A.N. These credit reports were mailed on or about February 21, 2024 via U.S. Postal Service First Class Mail to a Post Office box location known to the United States Attorney. On or about February 28, 2024, in furtherance of this scheme, a government-controlled post office box received an envelope from YEGHIAZARYAN containing documents, which included two ChexSystems credit reports for the stolen identities of E.T. and A.N. YEGHIAZARYAN supplied the two fraudulent drivers' licenses during and in relation to mail fraud, in violation of 18 U.S.C. § 1341. This constitutes aggravated identity theft, in violation of 18 U.S.C. §1028A.

## CONCLUSION AND REQUEST FOR SEALING

57. Based on the foregoing, there is probable cause to believe that YEGHIAZARYAN committed: (a) three counts of wire fraud, in violation of 18 U.S.C. § 1343; (b) two counts of money laundering, in violation of 18 U.S.C. § 1957, and (c) two counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A.

58. Because this application involves an ongoing criminal investigation and because disclosure of the information herein and the warrant being requested herein would likely compromise the investigation by informing targets of the investigation of the nature and techniques of the investigation, and affording the targets of the investigation opportunities to flee or to destroy or to tamper with evidence or witnesses, your affiant requests that the arrest warrant, criminal complaint, and this affidavit, and all related papers, be sealed by the Court, and be unsealed upon further order of the Court.

       /s Stewart A. Kukis
Stewart A. Kukis, Special Agent
Internal Revenue Service
Criminal Investigation

Subscribed and sworn to me
Telephonically
This _____ day of _____ 2024

_____
[signature: Elizabeth Hey]
E. HEY
UNITED STATES MAGISTRATE JUDGE

Digitally signed by ETH Signature
Date: 2024.08.01 11:20:23 -04'00'