IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 24-280-GJP |
| ZAVEN YEGHIAZARYAN | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by its attorneys, David Metcalf, United States Attorney for the Eastern District of Pennsylvania, Mary E. Crawley, Assistant United States Attorney, and Megan Curran, Special Assistant United States Attorney, respectfully submits this sentencing memorandum to assist the Court in imposing sentence upon the defendant, Zaven Yeghiazaryan. For the reasons that follow, the government respectfully submits that a sentence within the guideline range of 57 to 71 months imprisonment is sufficient but not greater than necessary to punish Yeghiazaryan for his various fraud schemes and money laundering offenses.

The Court has scheduled the sentencing hearing in this case for November 6, 2025, at 2:00 p.m.

The Third Circuit has set forth a three-step process which the district courts must follow in compliance with the Supreme Court's ruling in *United States v. Booker*, 543 U.S. 220 (2005):

> (1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker*.
>
> (2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-*Booker* case law, which continues to have advisory force.
>
> (3) Finally, they are to exercise their discretion by considering the relevant § 3553(a) factors in setting the sentence they impose regardless whether it varies from the sentence calculated under the Guidelines.

*United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006) (quotation marks, brackets, and citations omitted) (citing *United States v. King*, 454 F.3d 187, 194, 196 (3d Cir. 2006).

At the third step of the sentencing process, the Court must consider the advisory guideline range along with all the pertinent considerations of sentencing outlined in 18 U.S.C. § 3553(a) in determining the final sentence. "The record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted).

The government explains below its view of the proper consideration in this case of the advisory guideline range and of the Section 3553(a) factors.

**I.      PROCEDURAL BACKGROUND**

On August 6, 2024, a grand jury in this district returned an indictment filed at Criminal No. 24-280-GJP ("the indictment") charging the defendant, Zaven Yeghiazaryan, with three counts of wire fraud in violation of 18 U.S.C. § 1343 (Counts One through Three); two counts of "spending" money laundering in violation of 18 U.S.C. § 1957 (Counts Four and Five); wire fraud conspiracy in violation of 18 U.S.C. § 1349 (Count Six); health care fraud in violation of 18 U.S.C. § 1347 (Count Seven); six counts of money laundering in violation of 18 U.S.C. § 1956(a)(3) (Counts Eight through Thirteen); and two counts of aggravated identity theft in violation of 18 U.S.C. § 1028A (Counts Fourteen and Fifteen). These charges arose from the defendant's commission of fraud offenses targeting, among others, government programs, including through the use of shell companies and false identities, between at least January 2020

and April 2024. On May 20, 2025, pursuant to a written guilty plea agreement, the defendant pled guilty to Counts One through Three, wire fraud, in violation of 18 U.S.C. § 1343; Counts Four and Five, money laundering, in violation of 18 U.S.C. § 1957; Count Six, wire fraud conspiracy, in violation of 18 U.S.C. § 1349; Count Seven, health care fraud, in violation of 18 U.S.C. § 1347; and Counts Eight through Thirteen, money laundering, in violation of 18 U.S.C. § 1956(a)(3). The government agreed that at sentencing, it would move to dismiss Counts 14 and 15, aggravated identity theft, in violation of 18 U.S.C. § 1028A.

**II.    SENTENCING CALCULATION**

    A.  Statutory Maximum Sentence

Counts One through Three (Wire Fraud -- 18 U.S.C. § 1343): 20 years' imprisonment per count, 3 years of supervised release, a $250,000 fine per count, and a $100 special assessment per count.

Counts Four through Five (Money Laundering -- 18 U.S.C. § 1957): 10 years' imprisonment per count, 3 years of supervised release, a $250,000 fine per count or an alternate fine of not more twice the amount of the criminally derived property involved in the transaction, per count, and a $100 special assessment per count.

Count Six (Conspiracy to Commit Wire Fraud -- 18 U.S.C. § 1349):  20 years' imprisonment, 3 years of supervised release, a $250,000 fine, and a $100 special assessment.

Count Seven (Health Care Fraud -- 18 U.S.C. § 1347): 10 years' imprisonment, 3 years of supervised release, a $250,000 fine, and a $100 special assessment.

Counts Eight through Thirteen (Money Laundering -- 18 U.S.C. § 1956(a)(3): 20 years' imprisonment per count, 3 years of supervised release, a $250,000 fine per count or alternatively, an amount not more than twice the amount of the criminally derived property involved in the transaction, and a $100 special assessment per count.

The total statutory maximum sentence that may be imposed on the defendant is 230 years imprisonment, a three-year period of supervised release, a $3,250,000 fine, and a mandatory $1,300 special assessment. Restitution of $334,905 shall be ordered as well as forfeiture of all

proceeds involved in the Counts One, Two, Three, Six, and Seven offenses, and all property involved in the Counts Four, Five, and Eight through Thirteen offenses.

B.      Sentencing Guidelines Calculation

In the Presentence Report ("PSR"), the Probation Office correctly calculated defendant Yeghiazaryan's advisory guideline imprisonment range as 57 to 71 months. PSR ¶ 159.

1. Grouping

The defendant's conduct forms two groups, pursuant to U.S.S.G. §§ 3D1.2(d). Counts 1, 2, 3, 6 and 7 are grouped for guideline purposes because the offense level is determined largely on the basis of the total amount of harm or loss. Counts 4 and 5 are further grouped with Counts 1, 2, 3, 6 and 7 because the counts embody conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts pursuant to U.S.S.G. § 3D1.2(c); U.S.S.G. § 2S1.1, App. Note 6.

Counts 8 through 13 are grouped separately, as their own group, pursuant to U.S.S.G. § 3D1.2(d).

As there are two distinct groups, there is a multi-count adjustment, pursuant to U.S.S.G. § 3D1.4. PSR ¶ 79.

2. Group 1 Base Offense Level

The defendant's base offense level for group 1 (Counts 1 through 7) is 21, pursuant to U.S.S.G. § 2S1.1(a)(1). PSR ¶ 80. As calculated in the PSR, the defendant's offense level should be increased by twelve levels under U.S.S.G. § 2B1.1(b)(1)(G), because the loss was $334,905.94, which is more than $250,000 but less than $550,000. This was further increased by

4

by two levels under U.S.S.G. § 2B1.1(b)(10)(C), because the offense involved sophisticated means, and the defendant intentionally engaged in conduct or caused the conduct constituting sophisticated means.

3. Specific Offense Enhancement, Money Laundering

As calculated in the PSR, the defendant's offense level should be increased by one level under U.S.S.G. § 2S1.1(b)(2)(A), because the defendant was convicted under 18 U.S.C. § 1957 in Counts 4-5. PSR ¶ 81.

4. Organizer/Leader

As calculated in the PSR, the defendant's offense level should be increased by two levels under U.S.S.G. § 3B1.1(c), because the defendant was the organizer, leader, manager, or supervisor of criminal activity involving fewer than five participants. PSR ¶ 83.

5. Group 2 Base Level

The defendant's base offense level for group 2 (Counts 8 through 13) is 22, pursuant to U.S.S.G. § 2S1.1. PSR ¶ 86. As calculated in the PSR, the defendant's offense level should be increased by fourteen levels under U.S.S.G. §§ 2S1.1(a)(2), 2B1.1(b)(1)(H), because the value of the laundered funds was $1,323,200, which is more than $550,000 but less than $1,500,000.

6. Specific Offense Enhancement, Business of Laundering Funds

As calculated in the PSR, the defendant's offense level should be increased by four levels under U.S.S.G. § 2S1.1(b)(2)(C), because the defendant was in the business of laundering funds. PSR ¶ 87.

7. Multiple Count Adjustment

As calculated in the PSR, the defendant's offense level should be increased by two levels under U.S.S.G. § 3D1.4, because the defendant was charged with various crimes, which applied two adjusted offense levels to his crimes. PSR ¶ 92-94.

8. Acceptance of Responsibility

The PSR properly concluded that the defendant does qualify for a three-level offense level reduction for acceptance of responsibility. PSR ¶ 97-98.

9. Final Offense Level

With a total offense level of 25, the defendant's sentencing guideline range is 57 to 71 months of imprisonment. PSR ¶ 159.

### III. ANALYSIS

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and impose a sentence within the range." *Peugh v. United States*, 569 U.S. 530, 542 (2013) (quoting *Freeman v. United States*, 564 U.S. 522, 529 (2011) (plurality opinion); ellipsis in original). "Common sense indicates that in general, this system will steer district courts to more within-Guidelines sentences." *Peugh*, 569 U.S. at 543. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id.* at 544.

In addition, this Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the

offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

### Consideration of the 3553(a) Factors

**1. The nature and circumstances of the offense.**

Defendant Yeghiazaryan engaged in several significant fraud schemes, and money laundering, which he undertook to add to his significant wealth. He spun a convoluted web of shell businesses in order to commit fraud against government programs to unjustly enrich himself. As shown by the range of charges to which Yeghiazaryan pleaded guilty, he submitted false documents to whatever governmental entity he could steal from.

Brazenly, Yeghiazaryan even took advantage of the national emergency of the COVID-19 pandemic. Soon after the federal government declared a national emergency and began to take action to respond to the crisis, defendant started scheming to steal the relief funds intended to save small businesses from going bankrupt. Having already established numerous shell businesses, he utilized those shells to apply for the Economic Injury Disaster Loan ("EIDL") program, rushing to pocket and launder as much money as he could before federal funding ran out.

As the defendant bragged to others, he used those stolen funds to invest and make significant money through cryptocurrency. During this time, in December 2021, he upgraded

from a modest home in Northeast Philadelphia to a large suburban mansion, which he filled with gold coins, luxury watches, and high-end designer goods and fashions.

But for this defendant, the money he stole committing fraud using his shell business was not enough. Yeghiazaryan, using and assisted by a fellow fraudster, Yeghiazaryan also applied for Pandemic Unemployment Assistance Funds ("PUA"), funds designated for those workers who had lost their sources of income due to the pandemic. For this fraud, Yeghiazaryan laughed in the government's face, establishing the username for most of these fraudulent accounts as XAYLAVA#. In Russian, this roughly translates to "bullshit" or getting something for free by dubious means. For the fraudulent applications Yeghiazaryan submitted under various stolen identities, none of these individuals had lost their jobs to the pandemic as none even had jobs in America to lose. Four of the identities applied for by Yeghiazaryan were not even present in the United States at the time of filing or the months of claiming the funds. Instead, these funds went directly into Yeghiazaryan's pocket. One of the identities was completely stolen and fabricated as the true identity belonged to a former J-1 Visa holder who spent only months in the United States and never returned. Boldly, Yeghiazaryan even used this identity in connection with his money laundering operation, discussed more below. In connection with this PUA scheme, Yeghiazaryan stole another $105,645 from the government as he was compelled to exploit easy-to-steal disaster funds.

In yet another fraud scheme, the defendant committed healthcare fraud. Yeghiazaryan, using a friend's home healthcare agency,[1] became employed to provide health care, specifically personal care assistance to his friend and business partner, Person 3. Person 3 is truly disabled and has been authorized to receive 112 hours per week of personal care assistance, funded by

---

[1] The home health care agency was a "friend" he made while he was a J-1 visa holder himself.

Medicaid. While his friend is paralyzed and likely does truly qualify for personal care assistance, Yeghiazaryan, using his friend's home health care agency, signed up to provide PCA services to his friend, Person 3. Yet, for a friend truly in need, Yeghiazaryan, aided and abetted by someone unknown, fraudulently asserted he was supplying those needed PCA services, when in reality he was out of the country, often back in his home country of Armenia.[2]

Yeghiazaryan, aided and abetted by person or persons unknown, submitted false electronic clock-ins and clock-outs through the software program that is used by many home health care companies to track PCA hours. The personal care assistance services were not provided to Person 3, as Yeghiazaryan was out of the country incapable of providing any care. Yeghiazaryan caused more fraud loss to the government with the fraudulent claims of providing services that could not be and were not rendered. This totaled at least approximately $12,560.94 to be submitted to Medicaid for personal assistance services not rendered for which he obtained payments of approximately $8,379.30. In keeping with the defendant's common theme of not leaving government money on the table when it could be stolen, the defendant stole even in connection with a disabled friend who purports to be truly in need of this medical assistance.

And yet in further addition to all of this government fraud, it was known to the investigative team that Yeghiazaryan had been a money launderer, suspected of utilizing shell companies and stolen identities to conceal and further the execution of cleaning dirty money.[3] To determine the extent of Yeghiazaryan's money laundering activities and potentially identify

---

[2] The government notes that Armenia is a country which Yeghiazaryan claimed asylum for fear of retribution, yet he visits there often in contradiction to his asylum claim.

[3] Even when arrested, defendant was in possession of credit cards and identity documents in the name "Philip Niman," which is a synthetic identity created and used by Yeghiazaryan while the real Niman is by all accounts back in Russia.

additional targets, or breaches within the J-1 visa program, an undercover money laundering operation began.

During numerous recorded meetings between Yeghiazaryan and undercover agents, the agents, in their undercover roles, explained how they engaged in medical fraud and discussed their operation. At the initial meeting, Yeghiazaryan bragged about his ability to launder funds and that he used to engage in money laundering before, with another individual, but that individual got caught.[4] At the first in-person meeting with the agents on October 26, 2023, when no funds had yet been exchanged, an undercover stated: "I have all this cash laying around and I need to get it cleaned." Without any hesitation, Yeghiazaryan responded: "Does 300,000 work for you? Or do you need more?" Yeghiazaryan presented himself as a money laundering expert, stating: "We'll tell you what we need, we'll tell you how we need it and we'll do what needs to be done." Yeghiazaryan was never instructed on how to launder the funds. Throughout the operation, Yeghiazaryan enthusiastically contacted the undercover agents, suggesting and even pushing for more opportunities to launder funds.

Yeghiazaryan alone decided how to conceal and clean the money. Yeghiazaryan took the acts to conceal the source of the funds, initially obtaining cashier's checks from fraudulently established bank accounts in the names of stolen J-1 identities, or from shell companies he had established a few months or even during the operations. To further conceal and separate himself from the underlying criminal conduct funding his money laundering, Yeghiazaryan also used other individuals to obtain the fraudulent cashier's checks that Yeghiazaryan then used to fund

---

[4] The government confirmed that the individual Yeghiazaryan was referring to was sentenced on September 12, 2024 by the Honorable John M. Younge, United States District Judge, to 120 months' imprisonment.

the operation. Often by the time the bank records were obtained, the individual who had obtained the checks, had departed the United States, often to Armenia.

As shown by his repeated recorded admissions to the people he believed were fellow criminals, Yeghiazaryan was the driving force in laundering what he believed to be health care fraud proceeds. From the defendant's perspective this was just another way he could make money from nothing.

A substantial sentence is warranted because money laundering is a serious offense, distinct from its underlying crime, and should be punished separately. Money laundering causes special harms to the community as it is difficult to detect and prove, but can also facilitate other serious crimes.

    **2.**    **The history and characteristics of the defendant.**

Yeghiazaryan is 44 years old. PSR page 3; ¶ 108. He is a naturalized citizen, originally of Armenia, who now resides in Newtown, Pennsylvania. PSR ¶ 123. He is the father of three and resides with his longtime partner in Newtown, Pennsylvania, which home was purchased in November 2021. PSR ¶ 115.

Yeghiazaryan reports that he was raised in a two-parent household in his home country of Armenia. PSR ¶ 111. This upbringing was impacted by the fall of the Soviet Union, but defendant maintains close relationships with both parents and communicates with them regularly. PSR ¶ 108. We note, however, that defendant used both of his parents' identities in connection with the charged offenses. His used his mother's identity as the nominee of the shell business in connection with the fraud charged in Count Two, and used his father's identity to file a fraudulent PUA claim while his father was back in Armenia, as charged in Count Six.

The defendant first entered the United States on a J-1 Visa in order to work at Six Flags Great Adventure in New Jersey. PSR ¶ 114. He has a college degree in economics from Yerevan University in Armenia. PSR ¶ 137. Though he has no professional licenses or certifications, the defendant reports he is a capable of construction-type work. PSR ¶ 139. Defendant reports to Probation he runs numerous purported businesses and manages his real estate holdings. PSR ¶ 141.

Before the charges brought in this case, the defendant had not had any prior contacts with law enforcement, absent a shoplifting arrest, while he was a J-1 visa holder. PSR ¶ 106. Despite the lack of a serious criminal record, it is hard to say his life in America has been crime free given his bragging about his prior money laundering experience and his other frauds.

Defendant has amassed considerable wealth and property holdings. But it is clear from the charges that he had, at least, a lucrative sideline in stealing from government programs, and another sideline as a money laundering expert. Defendant's history and characteristics and the nature and circumstances of his many offenses weigh heavily in favor of a significant sentence of imprisonment.

Defendant quickly realized he could make an additional buck by stealing disaster relief funds as soon as the money became available in March 2020, when the country was grappling with a public health crisis and faced the very real prospect of an economic collapse. He demonstrated through his various schemes he was willing to steal as much as he could and showed unbridled greed and cruelty toward fellow citizens who actually needed this money to survive. Also highly relevant to the defendant's characteristics and the nature and circumstances of the offense is how defendant used the money earmarked for persons in need: he upgraded his modest home to a mansion, and he splurged on gold coins and luxury watches.

Given his family background including escaping a life and childhood ravaged by war, obtaining an advanced education, and gaining citizenship through asylum, it is disheartening to review the deception Yeghiazaryan chose to engage in against the government that took him in, as well as his eager participation in money laundering large sums of money, all of which merit a significant sentence.

### 3. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

A custodial sentence within the advisory Guidelines range is also needed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense. The record of this case shows Yeghiazaryan simply has no respect for the law. He is a repeat fraud offender willing to steal anything available for his taking.

The willingness to commit fraud against so many government programs, some carried out against the backdrop of an unprecedented public health and economic crisis reflect a significant lack of respect for the law and the need for just punishment in this case. Defendant's lack of respect for the law is further shown by the disregard for the impact his actions had on his fellow citizens and the programs that were trying to provide aid to them.

Defendant flaunted his lack of respect for the law. In creating the fraudulent accounts to steal and plunder from the COVID-19 unemployment compensation program, the username created by defendant and his co-conspirator was "Xaylava(#)" for many of the accounts, a Russian word which roughly translates to "Getting something for free under dubious means." He was laughing in the face of this tragic pandemic as he stole the funds due to those truly suffering.

The PUA program was not for dubious means or a "freebie" for nothing; this program was to keep food on the table and a roof over the head of the true victims of the pandemic, forced out of work, and their way of making a living, due to the public health crisis in the country. For

13

those who needed these benefits to survive, it was their lifeline. For the defendant, this was just another way to get something for nothing.

Economic crimes, especially crimes against the government by its employees, have many victims - the government benefit program, the taxpayers, the public trust, the others in need of those stolen funds who are denied because of less funding being available, or denied improvement projects due to lack of funding, etc. Such crimes not only divert money from intended recipients but also erode the integrity and credibility of publicly funded programs, making them crimes with far-reaching and extremely serious consequences. When economic crimes are not punished, or are punished less severely, it erodes respect for the law and fails to provide just punishment for crimes that often strike at the foundation of our public safety net.

For that, Yeghiazaryan has earned a just sentence.

### 4. The need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.

There is a strong need in this case to impose a sentence that will specifically deter defendant from committing fraud post-release and protect the public from further fraud schemes by defendant. The sheer range of defendant's fraud schemes show that a significant sentence is required to deter him from committing more fraud. Further, defendant's eagerness to commit money laundering must be deterred. He had engaged in this conduct before. While this is his first criminal conviction, it only means he has never previously been held accountable for that conduct.

There is also a strong need to impose a sentence that generally deters others from committing fraud schemes like the defendant's. Stealing disaster relief money or committing fraud against the government is not without consequence. Like the need to promote respect for the law, a significant custodial sentence in a case such as this will signal to other potential

wrongdoers that there are serious consequences for exploiting a national emergency such as that brought on by the COVID-19 pandemic. Though that has ended, deterrence signals that fraud against the government will be prosecuted and wrongdoers will be held seriously accountable.

Indeed, anyone considering engaging in such fraud schemes or money laundering must be placed on notice that a significant prison sentence likely awaits them.

**5.     The need to avoid disparities among defendants with similar records**

Section 3553(a)(6) instructs courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Based upon Yeghiazaryan's rampant criminal conduct and his characteristics, a within-Guidelines sentence is appropriate for Yeghiazaryan's myriad crimes and does not present any risk of unwarranted sentencing disparities.

**6.     Other factors.**

There is no need in this case to adjust the sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D).

**7.     The need to provide restitution to victims of the offense.**

The government asks this Court to consider the impact of the defendant's crimes upon the various government benefits programs he defrauded, including the taxpayers who fund many of the benefit programs.

The defendant, through his guilty plea, agreed to pay restitution of $334,905. Since the time of the plea agreement, the United States Small Business Administration has confirmed the defendant has repaid the fraudulently obtained EIDL loans to the SBA.

Therefore, the government respectfully requests this Court order the remaining restitution be paid to:

1. $105,645 to Pennsylvania Department of Labor & Industry

    Directed to:
    PA UC Fund
    UI Payment Services
    PO Box 67503
    Harrisburg, PA 17106-7503

2. $12,560.94 to Pennsylvania Medicaid though AmeriHealth

    200 Stevens Drive
    Mailstop 13A
    Building 100
    Philadelphia, PA 19113

**8. Financial Penalties**

As defendant's vast array of crimes was not limited to fraud schemes, his willingness and ability to money launder was separately charged and considered. Through the plea agreement, the defendant agreed to pay a fine of $150,000 and a $1,300 special assessment.

With respect to forfeiture, the defendant agreed to an order of forfeiture for $324,325, which represents the proceeds he obtained in Counts One, Two, Three, Six, and Seven. He also agreed to a further order of forfeiture of $175,400 for the offenses in Counts Four and Five and $139,200 for the offenses in Counts Eight through Thirteen. In total, the defendant agreed to an order for $638,924. Defendant further agreed that the $61,756 in United States currency that was seized under warrant on August 2, 2024, may be forfeited as these were assets involved in the money laundering offense charged in Counts Eight through Thirteen.

## IV. CONCLUSION

For the foregoing reasons, all of the appropriate considerations of sentencing favor the imposition of a sentence within the applicable guideline range of 57 to 71 months' imprisonment, a fine of $150,000, along with an order of restitution in the amount of $118,205.94, forfeiture order in the amount of $638,924, and a special assessment of $1,300.

Respectfully submitted,

DAVID METCALF
United States Attorney


/s *Mary E. Crawley*
MARY E. CRAWLEY
Assistant United States Attorney

/s *Megan Curran*
MEGAN CURRAN
Special Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing was served by email on the defense counsel and U.S. Probation Officer listed below:

Susan Lin, Esquire
slin@krlawphila.com

Talia Santella
United States Probation Officer


*/s/ Megan Curran*
MEGAN CURRAN
Special Assistant United States Attorney


Date:   October 28, 2025